UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

No. 13-2187
_____

FRONT RANGE EQUINE RESCUE, et al.,
Plaintiffs-Appellants,

and THE STATE OF NEW MEXICO,
Plaintiff-Intervener-Appellant

v.

TOM VILSACK, Secretary U.S. Department of Agriculture, et al.,
Defendants-Appellees,

and RESPONSIBLE TRANSPORTATION, LLC, et al.,
Defendants-Interveners-Appellees.
_____

On Appeal From The United States District Court
For The District Of New Mexico (Hon. M. Christina Armijo)
_____

**APPELLANTS' REPLY BRIEF**
_____

Bruce A. Wagman
Schiff Hardin LLP
One Market, Spear Tower, 32nd Floor
San Francisco, CA 94105
415-901-8700

*Attorneys for Plaintiffs-Appellants*

Ari Biernoff
Office of the Attorney General
P.O. Drawer 1508
408 Galisteo Street
Santa Fe, NM 87504-1508
505-827-6086

*Attorneys for Intervener-Appellant*
*State of New Mexico*

Dated:  May 23, 2014

Oral Argument Requested

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ............................................................................................... 1

ARGUMENT ..................................................................................................... 2

    I.     STANDARD OF REVIEW ................................................................ 2

    II.    THIS DISPUTE IS MOOT BECAUSE NO FACILITY IS
         ELIGIBLE TO SLAUGHTER HORSES .................................................. 3

    III.   NEPA APPLIES TO THE GRANTS OF INSPECTION
         BECAUSE ISSUANCE OF A GRANT IS NOT A
         MINISTERIAL ACT ....................................................................... 7

         A.     Defendants' Arguments That NEPA Does Not Apply
              Are Contrary to the FMIA's Text .................................................. 8

         B.     Defendants' Reasoning Would Render NEPA
              Superfluous .................................................................... 13

         C.     USDA Already Considers Environmental Impacts ............... 16

    IV.   THE DIRECTIVE IS A FINAL AGENCY ACTION DUE TO
         ITS UNIQUE SIGNIFICANCE TO THE GRANTS OF
         INSPECTION ............................................................................. 18

    V.    DEFENDANTS CANNOT EXPLAIN AWAY THE
         MATERIAL FLAWS IN USDA'S DECISIONMAKING
         PROCESS ................................................................................... 20

         A.     USDA Failed to Consider Material Evidence and Drew
              Conclusions Unsupported by the Evidence ............................ 21

         B.     The Record Reflects That USDA Relied on Improper
              Political Considerations ................................................... 27

CONCLUSION ................................................................................................ 28

ORAL ARGUMENT STATEMENT ...................................................................... 28

CERTIFICATE OF COMPLIANCE ...................................................................... 30

CERTIFICATE OF DIGITAL SUBMISSION .......................................................... 30

CERTIFICATE OF SERVICE .............................................................................. 31

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*Bennett v. Spear*,
    520 U.S. 154 (1997) ......................................................................................... 18

*City of Arlington, Tex. v. F.C.C.*,
    133 S. Ct. 1863 (2013) ....................................................................................... 3

*Ctr. For Native Ecosystems v. Cables*,
    509 F.3d 1310 (10th Cir. 2007) ...................................................................... 18

*Department of Transportation v. Public Citizen*,
    541 U.S. 752 (2004) ................................................................................... 10, 11

*Disability Law Ctr. v. Millcreek Health Ctr.*,
    428 F.3d 992 (10th Cir. 2005) .......................................................................... 5

*FPL Food, LLC v. United States Department of Agriculture*,
    671 F. Supp. 2d 1339 (S.D. Ga. 2009) ........................................................ 19

*Fund For Animals v. Norton*,
    281 F. Supp. 2d 209 (D.D.C. 2003) .............................................................. 22

*Goos v. Interstate Commerce Commission*,
    911 F.2d 1283 (8th Cir. 1990) ........................................................................ 11

*Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*,
    702 F.3d 1156 (10th Cir. 2012) ...................................................................... 23

*In re L.F. Jennings Oil Co.*,
    4 F.3d 887 (10th Cir. 1993) .............................................................................. 4

*Kennecott Utah Copper Corp. v. Becker*,
    186 F.3d 1261 (10th Cir. 1999) .................................................................... 3, 7

*Kluver v. Sheets*,
    27 F. App'x 873 (9th Cir. 2001), 2000 WL 33986949 .................................. 8

*Limerick Ecology Action, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    869 F.2d 719 (3d Cir. 1989) ........................................................................... 16

*Mobil Exploration & Producing U.S., Inc. v. Dept. of Inter.,*
 180 F.3d 1192 (10th Cir. 1999) .......................................................... 19

*Munsell v. Department of Agriculture,*
 509 F.3d 572 (D.C. Cir. 2007) ............................................................ 19

*N.L.R.B. v. Globe Sec. Serv's., Inc.,*
 548 F.2d 1115 (3d Cir. 1977) ................................................................ 4

*National Association of Home Builders v. Defenders of Wildlife,*
 551 U.S. 644 (2007) ............................................................................ 11

*Nat'l Parks & Conservation Ass'n v. Babbitt,*
 241 F.3d 722 (9th Cir. 2001) ............................................................... 23

*Natural Res. Def. Council, Inc. v. Sec. & Exch. Comm'n,*
 389 F. Supp. 689 (D.D.C. 1974) ......................................................... 15

*Natural Resources Defense Council, Inc. v. U.S. E.P.A.,*
 822 F.2d 104 (D.C. Cir. 1987) ............................................................ 14

*Nevada v. United States,*
 221 F. Supp. 2d 1241 (D. Nev. 2002) ............................................ 11, 12

*Olenhouse v. Commodity Credit Corp.,*
 42 F.3d 1560 (10th Cir. 1994) ......................................................... 6, 26

*Oregon Natural Desert Ass'n v. U.S. Forest Serv.,*
 465 F.3d 977 (9th Cir. 2006) ............................................................... 19

*Pub. Serv. Co. of Colo. v. EPA,*
 225 F.3d 1144 (10th Cir. 2000) ........................................................... 19

*Rocky Mt. Oil & Gas Ass'n v. Watt,*
 696 F.2d 734 (10th Cir. 1982) ............................................................. 18

*Sac & Fox Nation of Missouri v. Norton,*
 240 F.3d 1250 (10th Cir. 2001) .................................................. 3, 11, 12

*San Juan Citizens' Alliance v. Salazar,*
 2009 WL 824410 (D. Colo. Mar. 30, 2009) .......................................... 6

*Shawnee Tribe v. U.S.*,
423 F.3d 1204 (10th Cir. 2005) ................................................................... 4

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) ..................................................................................... 13

*South Coast Air Quality Management District v. F.E.R.C.*,
621 F.3d 1085 (9th Cir. 2010) .................................................................... 14

*Strycker's Bay Neighborhood Council, Inc. v. Karlen*,
444 U.S. 223 (1980) ..................................................................................... 15

*U.S. ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc.*,
190 F.3d 1156 (10th Cir. 1999) .................................................................... 4

*W. Energy Alliance v. Salazar*,
2011 WL 3738240 (D. Wyo. Aug. 12, 2011) (unpublished) ....................... 18

*Winter v. Natural Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ......................................................................................... 23

**<u>Statutes</u>**

15 U.S.C. § 78b ............................................................................................. 15

16 U.S.C. § 1247(d) ...................................................................................... 12

21 U.S.C. § 603(a) ............................................................................. 8, 9, 10, 12

24 U.S.C. § 411(b) ........................................................................................ 15

33 U.S.C. § 1342(b) ...................................................................................... 11

42 U.S.C. § 3531 ........................................................................................... 15

42 U.S.C. § 4332 ................................................................................. 2, 13, 14

42 U.S.C. § 4332(C)(i) .................................................................................. 16

49 U.S.C. § 13902(a)(1) ................................................................................ 11

Consolidated Appropriations Act of 2014, Pub. L. No. 113-76, § 745 (2014) ............ 4

Pub. L. No. 90-201, 81 Stat. 584, 588 (1967) .............................................. 10

**Other Authorities**

Conf. Rep. No. 765, 91st Cong., 1st Sess. ................................................................ 13

H.R. Rep. No. 90-653 at 23 (1967) ......................................................................... 10

*In Re Application of Valley Meat Company for Ground Water Discharge Permit Renewal, DP-236*, No. GWB 13-05(P) at 37 (Jan. 7, 2014) ("Hearing Officer's Report"), *available at* http://www.frontrangeequinerescue.org/documents/water-permit-report.pdf ................................................................................................................ 23

Regulation of Disclosures, Exchange Act Release No. 5627, 8 S.E.C. Docket 73, 1975 WL 160503 (Oct. 14, 1975) ........................................................ 15, 16, 18

Song, W. *et al.*, Selected Veterinary Pharmaceuticals in Agricultural Water and Soil from Land Application of Animal Manure, 39 J. ENVIRON. QUAL. 4, 1211-17 (2010) ..................................................................................................................... 25

**Regulations**

7 C.F.R. § 1b.4(a) ..................................................................................................... 20

9 C.F.R. § 304.2 ....................................................................................................... 16

No table of authorities entries found.No table of authorities entries found.

## <u>INTRODUCTION</u>

The Appellants ("FRER") challenge the federal defendants' ("USDA" or the "Agency") determinations that the National Environmental Policy Act ("NEPA") does not apply to its decisionmaking under the Federal Meat Inspection Act ("FMIA") and that commercial horse slaughter operations will not significantly impact the environment.  USDA cannot justify its decisionmaking based on the FMIA as it is written or the administrative record.

As a threshold matter, the Court need not reach the merits because there is no longer an actual case or controversy to decide.  After the district court entered judgment, horse slaughter was indefinitely halted when Congress removed USDA's funding for inspections.  Even without the defund, no slaughter establishment is otherwise eligible to slaughter horses under state and federal law – not Valley Meat ("VM"), Responsible Transportation ("RT"), or Rains Natural Meats ("RNM").  This dispute is accordingly hypothetical, the case now moot. Therefore, the lower court's ruling should be vacated.

On the merits, the FMIA does not make granting inspection a ministerial act or preclude consideration of environmental effects, and NEPA requires consideration of the environmental impacts of commercial horse slaughter. Defendants have presented an utterly backwards interpretation of NEPA – that they need not comply with NEPA because the FMIA does not specifically require

it.  If adopted, USDA's interpretation would render NEPA superfluous.  Congress mandated that NEPA be applied "to the fullest extent possible," 42 U.S.C. § 4332, not that agencies only consider environmental impacts when their governing statute already directs them to do so.  Moreover, USDA already considers some environmental effects of its actions but seeks to avoid doing so under NEPA, as required.  The Court should find that NEPA applies.

Similarly, the record contains undisputed evidence of the risks and uncertainty associated with horse slaughter operations and is bereft of evidence supporting the Agency's assertion that its actions will not significantly affect the environment. USDA ignores and dismisses compelling record evidence without justification and pretends that the record supports its invocation of categorical exclusions, which are not based on relevant data, but sloppy assumptions and wishful thinking.  The record also reveals that USDA let improper political factors – its relationship with members of Congress and the slaughter industry – taint its decisionmaking.  Therefore, the categorical exclusions are arbitrary and capricious.

## ARGUMENT

### I.    STANDARD OF REVIEW.

The parties agree that this Court owes the district court's decision no deference.  *See* Response Brief of Federal Appellees ("USDA") at 20; Response Brief of Interveners-Appellees ("Interveners") at 16.  *See also Sac & Fox Nation of*

*Missouri v. Norton*, 240 F.3d 1250, 1260 (10th Cir. 2001). Courts must set aside agency action that is "arbitrary, capricious, or manifestly contrary to the statute," *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 (1984), and must only defer to agency decisions that are the product of formal adjudication or rulemaking. *See City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1874 (2013).

## II. THIS DISPUTE IS MOOT BECAUSE NO FACILITY IS ELIGIBLE TO SLAUGHTER HORSES.

Although FRER's lawsuit presented an actual controversy when the complaint was filed, the issues now are merely hypothetical. Because Congress removed all funding for horse slaughter inspections, USDA is unable to provide inspection services. Moreover, no facility is currently eligible to slaughter horses. Therefore, deciding whether USDA violated NEPA in acting to enable domestic horse slaughter will have no "effect in the real world." *See Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1266 (10th Cir. 1999). The Agency's and Defendant-Interveners' (collectively, "Defendants") arguments that Congress *may* appropriate funds for horse slaughter in the future, and VM, RT, and RNM *may* become eligible to slaughter horses at a later date are insufficient to revive this dispute. This case is moot.

A court may not decide a moot question "simply because [it] may have to face the same question in the future." *N.L.R.B. v. Globe Sec. Serv's., Inc.*, 548 F.2d

1115, 1118 (3d Cir. 1977). *See also U.S. ex rel. Hafter D.O.v. Spectrum Emergency Care, Inc.*, 190 F.3d 1156, 1160 (10th Cir. 1999) (Because "federal courts are courts of limited jurisdiction, we presume no jurisdiction exists. . . .").

This case is moot because the only relief FRER sought – an order blocking government inspection of horse meat – cannot be granted by this (or any other) Court. *See In re L.F. Jennings Oil Co.*, 4 F.3d 887, 889 (10th Cir. 1993) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." (quotation marks omitted)). Defendants have repeatedly admitted that FRER brought suit to stop commercial horse slaughter operations.[1] Earlier this year, Congress stopped them, suspending USDA's ability to provide horse slaughter inspection services and effectively banning horse slaughter. *See* Consolidated Appropriations Act of 2014, Pub. L. No. 113-76, § 745 (2014) (the "Act").

The Act mooted this case because it "eliminate[d] the source of the original dispute" – USDA's impending horse slaughter inspections. *See Shawnee Tribe v. U.S.*, 423 F.3d 1204, 1216 (10th Cir. 2005). USDA cannot be required to comply

---

[1] *See, e.g.*, Defendant-Interveners VM's, RNM's, and Chevaline, LLC's Response to Motion for Injunction Pending Appeal, Document 01019153750.

with NEPA before commencing horse slaughter because Congress prohibited USDA from commencing horse slaughter.[2]

In response, Defendants only argue about what *may* happen in the future, *see, e.g.*, Interveners at 24, but that does not confer jurisdiction on this Court. And the potential for future action changes nothing.[3] *See Globe Sec. Servs.*, 548 F.2d at 1118 (A court does not have authority to decide a moot question "simply because [it] may have to face the same question in the future.").

Even if Congress decides to fund horse slaughter inspections in the future,[4] there is only a hypothetical chance that any of the slaughterhouse interveners

---

[2] There can be no dispute that Congress enacted the relevant provision of the Act, Section 745, to ban horse slaughter. *See, e.g.*, Statement of Administration Policy, H.R. 2410 – Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2014 (June 25, 2013) (identical to the Act in relevant part) ("The Administration appreciates reinstatement of the Federal ban on horse slaughter. . . .").

[3] Interveners cite no authority for their claim that this dispute is capable of repetition but evading review merely because Congress could change course. *See* Interveners at 25-26. This is not a case where "the duration of the challenged action is too short to be fully litigated prior to its cessation or expiration," and congressional action regarding horse slaughter does not present an "inherent problem of limited duration. . . ." *See Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 997 (10th Cir. 2005).

[4] Just as the President's proposed budget for Fiscal Year 2014, which led to the Act, did not fund horse slaughter inspections, Office of the President, Budget of the United States Government, Fiscal Year 2014, app. at 197 (Apr. 10, 2013), *available at* http://www.gpo.gov/fdsys/pkg/BUDGET-2014-APP/pdf/BUDGET-2014-APP.pdf, so does the President's proposed budget for Fiscal Year 2015 not fund horse slaughter inspections, Office of the President,

could ever begin operations. The fact that each of VM, RT, and RNM *may* in the future become eligible to conduct commercial horse slaughter operations does not overcome their present ineligibility. *See, e.g.*, USDA at 2, 26-27. RT is ineligible because it "surrendered its grant of inspection for equines" in 2013 and has since been slaughtering cattle. *See* USDA at 26-27, n.10.[5] RNM is ineligible because it lacks both a grant of inspection and a state discharge permit. Appellants' Opening Brief ("Opening Brief") at 21. VM is ineligible because it has been enjoined from

---

Budget of the United States Government, Fiscal Year 2015, app. at 193 (Mar. 4, 2014), *available at* http://www.whitehouse.gov/sites/default/files/omb/budget/fy2015/assets/appendix.pdf. And the U.S. Senate Appropriations Committee has already voted to continue not funding horse slaughter inspections through Fiscal Year 2015. *See Horse Slaughter Defund On Track For Fiscal Year 2015*, FRONTRANGEEQUINERESCUE.ORG, (last visited May 22, 2014), *available at* http://www.frontrangeequinerescue.org/front-range-equine-rescue-horse-slaughter.php.

[5] Even if USDA's grant of inspection to RT was not moot, USDA is incorrect that FRER lacks standing to challenge the grant of inspection to that facility. While plaintiffs generally must submit affidavits or other evidence "to survive a motion for summary judgment," USDA at 23, this appeal concerns the review of agency action, not a motion for summary judgment. In its complaint, FRER adequately alleged standing of one or more plaintiffs. *See* Appellants' Appendix ("A") 46-47. FRER was not required to provide affidavits to demonstrate standing. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579-80 (10th Cir. 1994) (distinguishing between motions for summary judgment and judicial review of agency action under the APA); *San Juan Citizens' Alliance v. Salazar*, No. CIV.A.00CV00379REBCB, 2009 WL 824410, at *4 (D. Colo. Mar. 30, 2009) (unreported) (rejecting agency's argument that an affidavit was required to support standing in an administrative review case). And if USDA made this argument before the district court, FRER could have presented an affidavit.

slaughtering horses by a New Mexico state court and lacks a state discharge permit. *Id.* And, as USDA says, there is "no evidence that more applications for inspection are in the offing." USDA at 56. These facts render this case moot.[6]

Because this case is moot, the Court should vacate the district court's judgment. *See U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23 (1994) ("[V]acatur must be decreed for those judgments whose . . . review has become moot due to circumstances unattributable to any of the parties." (quotation marks omitted)); *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950) (when a federal case becomes moot, the "established practice" is to "reverse or vacate the judgment below and remand with a direction to dismiss").

## III.   NEPA APPLIES TO THE GRANTS OF INSPECTION BECAUSE ISSUANCE OF A GRANT IS NOT A MINISTERIAL ACT.

Even if this dispute is not moot, USDA's actions were arbitrary and capricious and contrary to law. USDA erroneously determined in its categorical exclusion memoranda that NEPA does not apply to the potential environmental hazards created by horse slaughter. A382-91, A412-19, A538-48. In support of this determination, Defendants make two principal arguments: that (1) issuance of a grant of inspection is a ministerial act and USDA has no discretion to place

---

[6] Similarly, that the grant of inspection issued by USDA to VM and new drug residue program created by USDA may someday have some "effect in the real world" does not overcome their present irrelevance. *See Kennecott Utah Copper Corp.*, 186 F.3d at 1266.

conditions on slaughterhouse operations, USDA at 18, and (2) USDA may not

consider environmental impacts because the FMIA does not affirmatively

authorize it to do so, *id*.

Each of Defendants' arguments is incorrect. First, the FMIA does not

require that USDA grant inspection *when* an applicant satisfies certain criteria; it

requires that slaughter establishments receive inspection services *before* their meat

is eligible for sale in commerce but still affords the Agency discretion to make that

determination. Second, USDA must consider environmental impacts because the

FMIA does not preclude such consideration and NEPA requires it.[7]

### A. Defendants' Arguments That NEPA Does Not Apply Are Contrary to the FMIA's Text.

In a strenuous attempt to avoid complying with NEPA, USDA argues that it

lacks discretion to consider environmental impacts because the FMIA *mandates*

that it provide inspection services whenever an applicant satisfies certain limited

criteria. According to USDA, Congress's use of "shall" in 21 U.S.C. § 603(a) makes

the Secretary's decision mandatory, ministerial, and nondiscretionary. *See, e.g.,*

---

[7] Aside from the merits of USDA's assertion that its issuance of grants of inspection is ministerial, A384, USDA is estopped from raising this argument because, in prior litigation, it asserted the exact opposite position. *See* J. Br. Appellees, *Kluver v. Sheets*, 27 F. App'x 873 (9th Cir. 2001), 2000 WL 33986949, at *24-25 ("*Kluver* Brief") (asserting that whether to grant inspection is "plainly" a "discretionary determination"). USDA should not be permitted to shift its stance on the scope of its authority under the FMIA based on its litigation position.

USDA at 29.  To advance this position, Defendants rely on the FMIA language stating that "the Secretary shall cause to be made . . . an examination and inspection of all amenable species. . . ."  *See* Interveners at 32-33; USDA at 29.

Under Defendants' interpretation, the FMIA states that USDA *shall* provide inspection services *if* a slaughter establishment satisfies the requirements imposed by USDA.  *See* USDA at 18 (FMIA "requires the agency to grant inspection to establishments that satisfy the applicable food safety criteria. . . .").  But this is not what the FMIA says,[8] or what it means.

Defendants' argument that the presence of "shall" mandates that USDA provide inspection services when slaughter establishments satisfy certain limited requirements only makes sense when the relevant FMIA provision is truncated. When read in its entirety, 21 U.S.C. § 603(a) merely establishes that USDA must provide inspection services *before* "amenable species" are "slaughtered and their meat" sold in commerce.  The FMIA prohibits the commercial sale of meat without

---

[8] The relevant part of 21 U.S.C. § 603(a) states as follows:

> For the purpose of preventing the use in commerce of meat and meat food products which are adulterated, the Secretary shall cause to be made, by inspectors appointed for that purpose, an examination and inspection of all amenable species before they shall be allowed to enter into any slaughtering, packing, meat-canning, rendering, or similar establishment, in which they are to be slaughtered and the meat and meat food products thereof are to be used in commerce. . . .

inspection; it does not require that USDA automatically provide inspection services.   *See* 21 U.S.C. § 603(a).   In other words, the mandate is to the slaughterhouse, not to USDA.

Defendants' efforts to use the FMIA's legislative history to support their backwards reading of the statute also fail.   When read in light of all relevant language in the provision at issue, there is nothing revealing or even notable about the 1967 FMIA amendment and related legislative history cited by USDA.   *See* USDA at 31.   Prior to 1967, the FMIA stated that "the Secretary of Agriculture, at his discretion, may cause to be made . . . an examination and inspection of all [amenable species] before . . . they are to be slaughtered. . . ."   *See* Pub. L. No. 90-201, 81 Stat. 584, 588 (1967).   After the 1967 amendment, the FMIA merely replaced "may" with "shall."   *See* H.R. Rep. No. 90-653 at 23 (1967).   Read in context, the House Report statement that the revision would "[m]ake ante mortem inspection mandatory rather than permissive," H.R. Rep. No. 90-653 at 6, simply means that inspection is mandatory for meat to be sold – not that inspection services must be granted to any applicant by USDA.   Prior to the amendment, meat could (in certain circumstances) be sold without an Agency inspection.

Based on their misreading of the FMIA, Defendants erroneously assert that the principles articulated in decisions such as *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004) are "clearly relevant, clearly appropriate and on-point."

*See* Interveners at 33-34.  According to Defendants, because the statutory language in each of these decisions contained the word "shall" and the court in each concluded that NEPA did not apply because the agency lacked discretion to consider environmental impacts, these decisions are "fully applicable here."  *See* USDA at 38.  Defendants are wrong.  As explained in FRER's Opening Brief, each of these decisions is distinguishable.  *See* Opening Brief at 33-35 (distinguishing *Public Citizen*, 541 U.S. 752; *Goos v. Interstate Commerce Commission*, 911 F.2d 1283 (8th Cir. 1990); *Sac & Fox Nation of Missouri*, 240 F.3d at 1250; and *Nevada v. United States*, 221 F. Supp. 2d 1241 (D. Nev. 2002)).

Unlike in the FMIA, in each of the decisions relied upon by the district court, A144-47, and by Defendants, the provision at issue contained language *requiring* the agency to act *if* certain conditions were met:

- In *Public Citizen*, the statute at issue stated that the agency "***shall*** register a person to provide transportation . . . as a motor carrier ***if*** [it] finds that the person is willing and able to comply with" various requirements established by the agency.  *See* 541 U.S. at 766 (quoting 49 U.S.C. § 13902(a)(1) (emphases added)).

- In *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ("*NAHB*") the statute at issue stated that the EPA "***shall*** approve each [state's] submitted program ***unless*** [it] determines that adequate authority [to carry out the program under state law] does not exist."  *See* 551 U.S. at 650-51 (quoting 33 U.S.C. § 1342(b) (emphases added)).

- In *Goos*, the statute at issue stated that the agency "***shall*** impose [certain] terms and conditions" on conversion of a rail line to a trail ***if*** a qualified entity "is prepared to assume full responsibility for

- 11 -

management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way. . . ." 16 U.S.C. § 1247(d) (emphasis added); *see* 911 F.2d at 1295.

- In *Sac & Fox*, the statute at issue established that the agency ***shall*** take certain tracts of land into trust ***once*** the tribe purchased them with specified funds. *See* 240 F.3d at 1262 (citing PL 98–602, October 30, 1984, 98 Stat 3149 and explaining that the statute's statement that "the approval of the Secretary for any payment by the Wyandotte Tribe of any funds . . . shall not be required" indicated that "the Secretary shall have no discretion in deciding whether to take into trust a parcel of land. . . ." (internal ellipses omitted)).

- And in *Nevada v. United States*, the statute at issue stated that the agency ***shall*** take certain tracts of land into trust ***once*** the tribe purchased them with certain funds. *See* 221 F. Supp. 2d at 1244 ("Title to all lands . . . acquired [under the Act] shall be held in trust by the United States. . . ." (citation and quotation marks omitted)).

In contrast to the statutes at issue in these decisions, the FMIA states that USDA ***shall*** provide inspection services ***before*** meat is eligible for sale in commerce, not that it *shall* act "*once*", "*if*", or "*when*" a slaughter establishment fulfills certain requirements. *See* 21 U.S.C. § 603(a). Therefore, the above cases are not applicable here, and the Agency cannot rewrite the FMIA's mandates to fit within them.[9]

---

[9] Nor can USDA count on deference to save its erroneous determinations that NEPA does not apply. "Because NEPA's mandate is addressed to all federal agencies, [USDA]'s determination that NEPA is inapplicable to the [FMIA] is not entitled to the deference that courts must accord to an agency's interpretation of its governing statute." *See Citizens Against Rails-to-Trails*, 267 F.3d at 1150. Moreover, even if only the interpretation of the FMIA was at issue, *Chevron* deference does not apply to the informal determinations made here. *See City of*

### B.     Defendants' Reasoning Would Render NEPA Superfluous.

According to Defendants, NEPA does not apply to USDA's issuance of grants of inspection because the FMIA is concerned with food safety, not the environment, and does not authorize USDA to consider environmental impacts. *See, e.g.*, USDA at 18.  Defendants have NEPA backwards:  Congress mandated that NEPA be applied "to the fullest extent possible," 42 U.S.C. § 4332, not that agencies only consider environmental impacts when their governing statute already directs them to do so.  NEPA covers all agency actions unless the agency's other statutory authority plainly prohibits or exempts it.  As discussed below, nothing in the FMIA precludes consideration of the environmental effects of USDA's actions under the FMIA, and NEPA requires it.

Congress considered and rejected the narrow interpretation of NEPA requested by Defendants.  In crafting NEPA, Congress initially had the statute's first substantive provision state that "nothing in this Act shall increase, decrease or change any responsibility or authority of any Federal official or agency created by any other provision of law."  *See* Conf. Rep. No. 765, 91st Cong., 1st Sess., at 9–10.

---

*Arlington, Tex.*, 133 S. Ct. at 1874.  And USDA's determination that deciding whether to issue a grant of inspection is a ministerial act directly conflicts with its prior pronouncement that whether to grant inspection is "plainly" a "discretionary determination," *Kluver* Brief at *24-25.  *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining that deference to an agency's statutory interpretation depends, among other things, on "its consistency with earlier and later pronouncements").

But Congress replaced that language with the broad mandate that NEPA be applied "to the fullest extent possible." *Id.* (codified at 42 U.S.C. § 4332). The "purpose of th[is] new language [wa]s to make it clear that each agency of the Federal Government shall comply with [NEPA] unless the existing law applicable to such agency's operations *expressly prohibits* or makes full compliance with one of the directives impossible." *Id.* (emphasis added). Consequently, NEPA's application to actions by an agency that is not charged with considering environmental impacts does not improperly "enlarge [the] agency's substantive powers or broaden [the] agency's discretion." *See* USDA at 48 n.14.[10]

NEPA represents Congress's recognition that most federal agencies are charged with a purpose other than protecting the environment but nevertheless take actions that may affect the environment. NEPA's application to the following agencies – none of them "authorized" (in the language of USDA) by their governing statute to consider the environmental effects of its actions –

---

[10] Defendants' cases do not hold otherwise. *See* USDA at 48. In *Natural Resources Defense Council, Inc. v. U.S. E.P.A.*, 822 F.2d 104, 128 (D.C. Cir. 1987), the court found that the agency improperly attempted to broaden its substantive powers by applying NEPA to a *private* action, not by applying NEPA to an actual agency action, such as issuing a grant of inspection. And in *South Coast Air Quality Management District v. F.E.R.C.*, 621 F.3d 1085, 1089 (9th Cir. 2010), NEPA actually applied to the agency action.

demonstrates that an agency's governing statute need not charge it with
considering environmental effects for NEPA to apply:

- Congress established the Armed Forces Retirement Home to provide
  "residences and related services for certain retired and former
  members of the Armed Forces." 24 U.S.C. § 411(b). NEPA applies
  to its actions, including redevelopments of its properties. *See* United
  States Armed Forces Retirement Home, Washington Master Plan,
  Final Environmental Impact Statement 1-3 (2007), *available at*
  https://www.afrh.gov/afrh/wash/Final_MP_EIS.pdf.

- Congress formed the Department of Housing and Urban
  Development to administer the principal federal programs that
  provide assistance for housing and urban development. 42 U.S.C. §
  3531. NEPA applies to its actions, including construction. *See*
  *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 228
  (1980).

- Congress created the Securities and Exchange Commission to
  protect investors, maintain efficient markets, and facilitate capital
  formation. 15 U.S.C. § 78b. NEPA applies to its actions, giving it
  authority to require registrants to make environmental disclosures.
  *See Natural Res. Def. Council, Inc. v. Sec. & Exch. Comm'n*, 389 F. Supp.
  689, 695 (D.D.C. 1974).[11]

NEPA applies to the grants of inspection because their issuance was not
ministerial, *see supra* Section III.A, and the FMIA does not prohibit USDA from
considering environmental effects. *See Limerick Ecology Action, Inc. v. U.S. Nuclear*

---

[11] *See also* Regulation of Disclosures, Exchange Act Release No. 5627, 8 S.E.C.
Docket 73, 1975 WL 160503, at *1 (Oct. 14, 1975) ("[The Securities and Exchange
Commission] is generally not authorized to consider the promotion of social
goals unrelated to the objectives of the federal securities laws, [but] it is
authorized and required by the National Environmental Policy Act of 1969
(NEPA) to consider the promotion of environmental protection as a factor in
exercising its rulemaking authority under the Securities Act of 1933 and the
Securities Exchange Act of 1934.").

*Regulatory Comm'n*, 869 F.2d 719, 729 (3d Cir. 1989) (NEPA applies unless an agency's governing statute states otherwise). Defendants' assertion that the FMIA itself does not authorize USDA to consider environmental effects when issuing grants of inspection is irrelevant because NEPA requires that USDA consider environmental effects. *See* 42 U.S.C. § 4332(C)(i) ("authoriz[ing] and direct[ing]" all federal agencies to consider "the environmental impact of the[ir] proposed action[s]"); *Limerick Ecology Action*, 869 F.2d at 729 (an agency's governing statute "cannot preclude application of NEPA by implication"); *see also* Regulation of Disclosures, 1975 WL 160503, at *9 ("NEPA is unique in that Congress, in this single enactment, supplemented the mandate of all federal agencies to include consideration of environmental values within agency responsibility.").

### C.    USDA Already Considers Environmental Impacts.

Even under its narrow construction of the applicability of NEPA, USDA itself has acknowledged its authority to consider the environmental impacts of its actions under the FMIA. One of its own regulations, 9 C.F.R. § 304.2, requires slaughter establishments to certify compliance with water quality standards before obtaining a grant of inspection. Rather than denying that the purpose of this regulation is to protect the environment, USDA concedes the point. *See* USDA at 34 ("[T]he water quality provision deals with potential impacts to the

waters of the United States rather than food safety. . . .).  That USDA chose to limit the scope of its authority under that regulation does not offset its concession that it may consider environmental impacts under the FMIA.  Furthermore, in reviewing VM's application for a grant of inspection, USDA expressly decided to require its inspectors to ensure that VM adhered to New Mexico environmental laws on solid waste composting.  *See* Appellees' Joint Supplemental Appendix ("SA") 103.

If USDA has authority to consider environmental impacts under its own regulation and inherent authority, then it certainly has authority to consider environmental impacts under NEPA, an act of Congress.[12]  USDA cannot pick and choose when and where environmental impacts should be considered, nor

---

[12] The Amici Curiae offer two contradictory arguments in support of USDA's actions.  First, Amici argue that, if NEPA applies to grants of inspection, then USDA will be overwhelmed by environmental concerns and the safety of the nation's food supply will be jeopardized.  *See* Amicus Brief at 6-8.  Therefore, according to Amici, USDA lacks discretion to consider environmental effects and NEPA does not apply to grants of inspection.  *See id.*  Second, Amici argue that, even if NEPA does apply to grants of inspection, and FRER is correct that there are extraordinary circumstances here such that the categorical exclusions are insufficient, "all future grants of inspection would remain exempt" under the categorical exclusion.  *See id.* at 9-10.  Plainly, the first argument provides no connection between the unsupported fear-mongering (USDA will be overwhelmed if it is required to comply with federal law) and the conclusion (therefore no discretion is provided).  The second argument is closer to reality.  As FRER has repeatedly explained, in this action it is challenging USDA's actions based on the unique nature of commercial horse slaughter and the grants of inspection here.

can it override congressional direction that "all federal agencies [ ] include consideration of environmental values within agency responsibility." *See* Regulation of Disclosures, 1975 WL 160503, at *9.

## IV.   THE DIRECTIVE IS A FINAL AGENCY ACTION DUE TO ITS UNIQUE SIGNIFICANCE TO THE GRANTS OF INSPECTION.

USDA's issuance of the Directive was final agency action because it represented the culmination of its decisionmaking and because USDA preconditioned the grants of inspection on the Directive's adoption. *See* Opening Brief at 45-47; SA118.  Instead of rebutting Appellants' arguments, Defendants offer two unconvincing assertions.

The courts have rejected Defendants' first contention that informal agency action cannot constitute final agency action.  *See, e.g., Ctr. For Native Ecosystems v. Cables*, 509 F.3d 1310, 1330 (10th Cir. 2007) ("instructions" that served as a "management tool"); *Rocky Mt. Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 739-41 (10th Cir. 1982) (handbook that "set out [agency's] management polices"); *W. Energy Alliance v. Salazar*, 2011 WL 3738240, at *5-6 (D. Wyo. Aug. 12, 2011) (unpublished) (instructions and guidance describing agency procedures).  Rather, informal agency actions, including internal guidance, are final agency action when they satisfy the test established by *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997), which the Directive does. *See, e.g., W. Energy Alliance*, 2011 WL 3738240, at *6.

Second, Defendants are also incorrect that the Directive must determine the rights or obligations of *FRER* or have legal consequences for FRER to be final agency action. *See* USDA at 65. In this Circuit, agency action need not have a direct legal effect on its challengers to be subject to judicial review. *See Cables*, 509 F. 3d at 1330 (challenged action had "clear and definite consequences for permittees," who were not the plaintiffs); *see also Oregon Natural Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 990 (9th Cir. 2006) (same). Defendants' cases do not hold otherwise. *See Mobil Exploration & Producing U.S., Inc. v. Dept. of Inter.*, 180 F.3d 1192, 1199 (10th Cir. 1999) (court did not even analyze the "rights or obligations" prong of the *Bennett* test); *Pub. Serv. Co. of Colo. v. EPA*, 225 F.3d 1144, 1148 (10th Cir. 2000) (court considered the rights and obligations of not only the challenging party but also "any other entity").[13]

---

[13] Moreover, neither of the cases cited in this Court's Order, Document 01019172568, at 5-6, which denyied Plaintiffs' motion for an injunction pending appeal, supports a finding that the Directive does not constitute final agency action. First, in *FPL Food, LLC v. United States Department of Agriculture*, 671 F. Supp. 2d 1339 (S.D. Ga. 2009), although the court described FSIS directives generally as "instructions" and "guidance documents" used by FSIS to "implement the USDA's policies and procedures," it did not hold that the directive there was not final agency action. Rather, the court agreed with the plaintiff that the directive was a binding source of law, subject to review under the APA, and rejected USDA's argument that the directive was "merely an internal guidance on how to handle industry complaints and was never intended to bind agencies." *Id.* at 1352-53. Likewise, in *Munsell v. Department of Agriculture*, 509 F.3d 572, 585 (D.C. Cir. 2007), the court noted that it was "not altogether clear whether [the FSIS directive at issue] reflects a final agency rule that is subject to judicial review . . . or a nonreviewable policy statement," but

Because NEPA applies and the Directive is final agency action, USDA's failure to invoke, at minimum, a categorical exclusion for the Directive is arbitrary and capricious and contrary to law.

## V.    DEFENDANTS CANNOT EXPLAIN AWAY THE MATERIAL FLAWS IN USDA'S DECISIONMAKING PROCESS.

Courts must strike agency actions that can only be justified by ignoring undisputed evidence and drawing conclusions that are unsupported.   In invoking the categorical exclusions here, the Agency failed to consider material evidence, offered explanations contrary to the evidence, and relied on factors that Congress did not intend it to consider.   These fatal defects resulted in USDA's implausible conclusion that there is no possibility that commercial horse slaughter operations may significantly affect the environment, which is all that is required to require at least an environmental assessment. *See* 7 C.F.R. § 1b.4(a).

Because commercial horse slaughter implicates at least one Council on Environmental Quality ("CEQ") significance factor (and more) and USDA's decisionmaking process was tainted by improper political considerations, the categorical exclusions are arbitrary and capricious and should be set aside.

---

also explained that the directive "appears to reflect USDA's final statement of rules [on testing certain meat products for *E. coli*]," "set[s] standards for enforcement actions," and has "a direct effect on [a plaintiff's] members."

### A.    USDA Failed to Consider Material Evidence and Drew Conclusions Unsupported by the Evidence.

As Appellants have explained, *Opening Brief* at 6-7, American horses are different than traditional food animals because they are not raised to become food and, therefore, are routinely administered substances with dangerous and unknown effects, which may contaminate the environment through byproducts of the slaughter process.   Defendants acknowledge FRER's environmental concerns but ignore and dismiss undisputed record evidence that supports them, and fail to identify any "substantial evidence" to the contrary.  *See* USDA at 50-51.   These core flaws in Defendants' reasoning taint their argument that horse slaughter implicates no CEQ significance factors and their ultimate conclusion that there is no possibility that horse slaughter may significantly affect the environment.

Careful examination of what the record does and does not say inexorably leads to the conclusion that USDA's reasoning was arbitrary and capricious.  First, FRER has identified undisputed record evidence that the vast majority of American horses are routinely administered chemical substances that are prohibited for use in food animals.  *See* Opening Brief at 6, 48.  No contrary record evidence exists.  In addition, USDA relied on flawed, inapplicable data to assert that drug residues in horses are less likely than in traditional food animals.  *See* Opening Brief at 52.  USDA's data is based on tests that did not even screen for the

majority of substances commonly administered to horses.[14]  Third, there is no evidence that USDA has or will test for substances that are the "most widely used" in horses.  *See* USDA at 56.[15]  Rather, the record demonstrates that USDA has made no independent effort to identify substances to test for in horses, A333-34, but merely tests horses for the same substances tested for in traditional food animals, A329.

Defendants do not dispute that the presence of one or more CEQ significance factors renders a categorical exclusion contrary to NEPA.[16]  But they incorrectly argue that none apply.

*First*, the grants of inspection are controversial (as defined by CEQ) because FRER has demonstrated a "substantial dispute as to the[ir] size, nature, or effect."  *See Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702

---

[14] Moveover, Defendants fail to explain USDA's dismissal of frequent positive results for antibiotics residues, USDA at 53, or refute the report of USDA's own inspector general, which identified numerous significant flaws in the national residue program.  *See* A186.  Consequently, there are many reasons to believe "that the number of positive results for [any substance] administered to horses is likely to be [] higher now than it was from 1997 through 2006."  *See* A528.

[15] Nothing in the Engeljohn Declaration, A518, or Federal Register excerpt cited by USDA, USDA at 56, supports the Agency's assertion that it has ever attempted to determine which substances are most commonly administered to horses.

[16] If commercial horse slaughter implicates any CEQ significance factor, then USDA's categorical exclusions are invalid.  *See Fund For Animals v. Norton*, 281 F. Supp. 2d 209, 235 (D.D.C. 2003) (presence of one or more of the CEQ significance factors normally requires preparation of an EIS).

F.3d 1156, 1181 (10th Cir. 2012). At best, USDA's assertion that commercial horse slaughter will have no significant effect on the environment is the product of disputed data and insupportable methodology. *See id.* at 1181-82; *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 736-37 (9th Cir. 2001), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008). At worst, USDA's assertion is based on willful ignorance of undisputed contradictory record evidence. *See supra* pp. 21-22. USDA's data is inadequate, and nothing in the record supports the Agency's bold claim that its tests will detect the presence of "any drug" used in horses, A334. *See* USDA at 55. USDA's determination is controversial not because FRER disagrees with it but because it was based on insufficient data, is contrary to the record, and is unreasonable. *See Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736-37 (finding controversy: "the agency's conclusions were not reached by reasoned extrapolation from the data, rather the data were simply insufficient").[17]

---

[17] The categorical exclusion for VM is also controversial in light of USDA's casual dismissal of VM's egregious environmental record, USDA at 57-58, and the conclusion by a state hearing officer that Valley Meat has demonstrated willful disregard for state environmental laws for over ten years, Hearing Officer's Report, *In Re Application of Valley Meat Company for Ground Water Discharge Permit Renewal, DP-236*, No. GWB 13-05(P) at 37 (Jan. 7, 2014) ("Hearing Officer's Report"), *available at* http://www.frontrangeequinerescue.org/documents/water-permit-report.pdf. *See Hillsdale Envtl. Loss Prevention*, 702 F.3d at 1182 (disagreement between agencies constitutes controversy).

*Second*, USDA unconvincingly relies on the same flawed data and assertions to conclude that commercial horse slaughter presents no serious, unique, or unknown risks to public health or safety.  Defendants' primary arguments in defense of the Agency's conclusion appear to be that (1) not all horses have detectable drug residues and (2) national residue program testing for *some* of the substances will detect the presence of *all* of them.  *See* USDA at 52-53.

Both arguments fail.  The first argument fails because FRER need not prove that residues will be present for all horses to require USDA to conduct at least an environmental assessment.  Rather, the undisputed facts that no American horses are raised to become food and the vast majority are administered substances prohibited for use in food animals is sufficient evidence to present a serious, unique, or unknown health risk.[18]  And as explained above, it is irrational to assert that testing for some substances will detect the presence of all substances routinely administered to horses.  Furthermore, until USDA received FRER's petition for rulemaking, there is no evidence that it was even

---

[18] USDA asserts that many of the "tens of thousands" of horses abandoned on public lands "have never been cared for by a human owner and, therefore, "are never treated with such drugs."  *See* USDA at 52 n.15 (citing SA20).  Yet again, this is not what the record says.  Instead, it states that some horses are abandoned by their owners, not that those owners never treated them with drugs prior to abandoning them.  *See* SA20.  It further states that abandoned horses have "poor survival prospects" and are likely to be injured, SA20, making them unlikely sources of horse meat or relevant to this action.

aware of the routine administration of these drugs to horses. Nor is there any evidence that these drugs or their byproducts' effects on humans or the environment have *ever* been tested. Finally, nothing in the record contradicts the serious, unique, and unknown environmental and public health risks posed by horse slaughter byproducts containing such substances. *See* Song, W. *et al.*, Selected Veterinary Pharmaceuticals in Agricultural Water and Soil from Land Application of Animal Manure, 39 J. ENVIRON. QUAL. 4, 1211-17 (2010) (environmental and public health risks result when animal byproducts infiltrate the ground and water supply).

*Third*, the Agency's defective decisionmaking is epitomized by its cursory, misleading dismissal of VM's atrocious record of violating New Mexico's environmental laws. *See* Opening Brief at 50, 54. Instead of addressing or even acknowledging that it has been aware of VM's history of violations since at least May 2013,[19] or the official finding that "Valley Meat has violated both the Water Quality Act and the Solid Waste Act in numerous ways consistently for more than a decade,"[20] the Agency remarkably pretends that VM's history of

---

[19] Opening Brief at 14 n.6.

[20] Hearing Officer's Report at 37.

violations does not exist.[21]  *See* USDA at 57-58.   USDA entirely ignores the hearing officer's finding that VM "committed *thousands of violations* of New Mexico environmental laws" and conclusion that VM "has continued its violations in spite of repeated requests, demands, and warnings from Department personnel."  *See* Hearing Officer's Report at 37-38 (emphasis added). Ignoring this obviously relevant information is a hallmark of arbitrary and capricious decisionmaking.  *See Olenhouse*, 42 F.3d at 1574.

*Finally*, USDA's argument that its grants of inspection are not precedential but are the result of a careful "case-specific determination" is unconvincing and contrary to its own decisionmaking.  Not only is the text of each categorical exclusion memorandum substantially the same, *compare* A382-91 *with* A412-19 *and* A538-48, but the RNM memorandum was based on entirely irrelevant information – a statement minimizing the threat of RNM's wastewater to the Gallatin, Missouri environment based on a wastewater system located hundreds of miles away in Gallatin, Tennessee.  A547.

The presence of any single CEQ factor renders application of a categorical exclusion erroneous.  Here the presence of all four factors triggers at least an environmental assessment.

---

[21] It is difficult not to infer that USDA would have been aware of VM's ignominious history had it not erroneously concluded that NEPA does not apply to the grants of inspection.

**B.    The Record Reflects That USDA Relied on Improper Political Considerations.**

Faced with a damaging memorandum documenting naked political considerations that tainted the Agency's decisionmaking process, USDA makes the only argument available – its statements about the need to enable horse slaughter to avoid wrath from the slaughter industry and Congress were taken out of "context." *See* USDA at 61. According to USDA, the Agency may have considered its own political interests in determining whether to enact enhanced measures to prevent and detect drug residues prior to enabling commercial horse slaughter. *See id.* But, USDA protests, it did not later consider those same interests in determining whether to conduct environmental review prior to enacting measures to detect drug residues and enable horse slaughter. *See id.* USDA apparently expects the Court to believe that it buckled to industry and congressional pressure to deny the petition for rulemaking but not to deny NEPA review *on the exact same issue*, even with the slaughter industry complaining that an environmental assessment "can require 18 months of work" and an environmental impact statement can "involve years of work." *See* Amicus Brief at 7. The Court should reject this self-serving denial, and consider these facts in evaluating USDA's decisionmaking.

## CONCLUSION

FRER requests that the Court dismiss the appeal as moot and vacate all orders associated with the case. In the alternative, FRER requests that this Court hold that USDA's administrative actions in adopting FSIS Directive 6130.1 and granting horse slaughter inspections to VM and RT violated NEPA and the APA and that those unlawful actions prejudiced FRER and, therefore, set them aside.

## ORAL ARGUMENT STATEMENT

Pursuant to 10th Cir. L. R. 28(C)(4), Plaintiffs state that oral argument is necessary because the issues involve important, unresolved questions, including whether the National Environmental Policy Act applies to U.S. Department of Agriculture actions with respect to horse slaughter operations taken under the Federal Meat Inspection Act, which appears to be an issue of first impression in the Tenth Circuit. Plaintiffs respectfully suggest that the Court may benefit from the interactive conversation that oral argument would provide on these issues.

Respectfully submitted this 23rd day of May 2014.

/s/ *Bruce A. Wagman*
BRUCE A. WAGMAN
(admitted pro hac vice)
ROCKY N. UNRUH (NM Bar#3626)
SCHIFF HARDIN LLP
One Market, Spear Tower, 32nd Fl.
San Francisco, CA 94105
Telephone: (415) 901-8700
Facsimile: (415) 901-8701
bwagman@schiffhardin.com
runruh@schiffhardin.com

*Attorneys for Plaintiffs-Appellants*


GARY K. KING
NEW MEXICO ATTORNEY
GENERAL

/s/ *Ari Biernoff*
Ari Biernoff
Assistant Attorney General
408 Galisteo Street
Santa Fe, NM 87501
Telephone: (505) 827-6086
Facsimile: (505) 827-6036
abiernoff@nmag.gov

*Attorneys for Intervener-Appellant State*
*of New Mexico*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that Plaintiffs' brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007/10 in 14-point Book Antiqua.

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that the copy of the foregoing response submitted in digital form via the Court's ECF system is an exact copy of the written document filed with the Clerk.

I further certify that all required privacy redactions have been made and that this brief has been scanned for viruses with McAfee VirusScan Enterprise version 8.8 and, according to this program, is free of viruses.

Privacy redactions:  no privacy redactions were required.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 23rd, 2014, I filed through the United States Appellate Court ECF System the foregoing document to be served by CM/ECF electronic filing on each counsel of record.

May 23rd, 2014

*/s/ Bruce A. Wagman*
BRUCE A. WAGMAN
SCHIFF HARDIN LLP